UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                   :

UNITED STATES OF AMERICA        :

              - v -                               :    23 Cr. 640 (VB)

ELIEZER TILSON,                    :

                  Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S SENTENCING MEMORANDUM

                                      DAMIAN WILLIAMS
                                      United States Attorney for the
                                        Southern District of New York

JAMES MCMAHON
Assistant United States Attorney

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
:
UNITED STATES OF AMERICA      :
: 23 Cr. 640 (VB)
- v -                         :
:
ELIEZER TILSON,               :
:
          Defendant.    :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Eliezer Tilson, now scheduled for August 1, 2024 at 11:30 AM. For the reasons discussed below, the Government respectfully submits a Guidelines sentence would be appropriate in this case.

I. The Offense Conduct

The defendant promoted and solicited investments in elder care facilities and other real estate projects. Victim 1 and Victim 2 were two residents of Brooklyn who invested with the defendant through their respective corporate entities. Prior to October 2019, Victims 1 and 2 both invested through the defendant in elder care facilities known as Pancho Memory Care and Pancho Tomball.

In late October 2019, the defendant solicited investments from Victims 1 and 2 in the Domus Multifamily Real Estate Trust No. 2, more simply known as Domus II. This real estate trust invested in multifamily residential real estate projects. Domus II had no relationship to Pancho Memory Care or Pancho Tomball other than the defendant's solicitation of funds on behalf of all three entities.

1

The defendant emailed the two victims a brochure relating to the Domus II investment that included a description of the properties and projections of the return on the investment. On or about October 30, 2019, Victim 1 told the defendant he was likely to invest $400,000 and that Victim 2 was likely to invest as well. The defendant said he would provide the victims with the details of where to send the money. The defendant also met with the two victims in a restaurant in Manhattan for dinner that night to discuss the investment.

The defendant emailed the two victims the wire instructions the next day, October 31. He told the victims to send their money to a bank account he controlled that was held by Pancho Real Estate Capital, LLP. Victim 1 wired $150,000 to the Pancho Real Estate account on October 31 and an additional $250,000 to the same account on November 4. Victim 2 wired $150,000 on or about November 1 and an additional $1000,000 on November 5 to the Pancho Real Estate account. The balance in the Pancho Real Estate account was less than $20,000 prior to Victim 1's first wire on October 31.

The defendant did not forward these funds to Domus II. Instead, between November 1 and November 5, he sent, in four separate wires, $396,000 from the Pancho Real Estate account to an account held by Pancho Memory Care REIT that he also controlled. From that account, he wired funds to approximately 25 individuals and entities to pay down debt incurred by Pancho Memory Care and to pay dividends to investors in Pancho Memory Care, including Victim 1, all between November 1 and November 4. The Pancho Memory Care REIT account did not have sufficient funds with which to make these payments prior to the four wire deposits totaling $396,000 that were funded by Victim 1 and Victim 2's money.

On or about November 12, 2019, Victim 1 learned from the manager of Domus II that the defendant had not wired his investment funds to Domus II. On November 13, the defendant sent

an email to both Victims in which he stated that he had spoken with the manager and that "we have the funds and you are very much part of the deal." The victims remained in touch by email with the defendant during the week of November 17, when he was in Thailand.

Ten days later, on November 23, the defendant falsely told both victims that he had "initiated the wire" to the Domus II manager but it had not gone through yet. On November 25, the defendant emailed Victim 1 a fabricated document, supposedly from his bank, that showed the Pancho Real Estate Capital account had a balance of $837,956.26. At that time, that account was overdrawn.

The next day, November 26, the defendant emailed both victims and said falsely that he had arranged wires to refund the victims' money. Attached to the email was a fabricated bank form indicating that an ACH payment for $400,000 had been made on or about November 25 to Victim 1's account. Another fabricated form attached to the email showed that the Pancho Real Estate Capital account had a balance of $437,931.26 after the payment, when the balance in this account was actually negative.

On December 2, the defendant spoke in a recorded conversation with both victims. The defendant responded to a question about where the victims' money had gone by stating "I used it to bridge other things and I was planning on money coming in right away to get you Domus."

On or about December 29 and December 30, the defendant sent Victim 1 a series of emails from Monsey, New York in which he assured Victim 1 that he was attempting to raise funds from another investor and a family member with which to repay the victims.

None of the Victims' money arrived at Domus II. The defendant has paid back a total of $350,000 of the $650,000 loss.

The defendant pleaded guilty to a violation of the Travel Act, Title 18, U.S.C., Sections

1952(a)(3) and 2.

II. <u>Calculation of the Offense Level</u>

The parties have stipulated to the following calculation of the defendant's applicable Guidelines range of 18 to 24 months in the plea agreement:

1. The November 2023 Sentencing Guidelines Manual applies to this case.

2. The base offense level is the offense level applicable to the underlying unlawful activity to which the travel or transportation was undertaken. U.S.S.G. § 2E1.2(a)(2).

3. The defendant committed fraud in the sale of securities, the underlying offense from which the laundered funds were derived, and the offense level for that offense can be determined. Accordingly, the base offense level is the offense level for fraud in the sale of securities. U.S.S.G. § 2S1.1(a)(1). None of the Specific Offense Characteristics of U.S.S.G. § 2S1.1 apply.

4. The base offense level is 6. U.S.S.G. § 2B1.1(a)(1).

5. The intended loss is more than $550,000 and less than $1,500,000. Accordingly, the offense level is increased by 14 levels. U.S.S.G. § 2B1.1(b)(1)(H).

6. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter pleas of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

7. The defendant meets all the criteria set forth is U.S.S.G. § 4C1.1. Accordingly, the offense level is reduced by 2 levels.

In accordance with the above, the applicable Guidelines offense level is 15. The defendant is in criminal history category I. The defendant's Guidelines range is 18 to 24 months' imprisonment. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 15, the applicable fine range is $7,500 to $75,000.

4

The parties also agreed that "either party may seek a sentence outside of the [18 to 24 month range] based upon the factors" identified in Section 3553(a).

III. Application of the Relevant Section 3553(a) Factors

An analysis of the relevant Section 3553(a) factors shows that a Guidelines sentence is warranted in this case.

    A. The Nature and Circumstances of the Offense

The nature of the offense is larceny, coupled with deception. The defendant promised to invest the victims' money in Domus II. Instead, he stole it immediately upon receiving it to pay down debt unrelated to Domus II and to pay dividends on other, unrelated investments. In doing so, he caused the victims unknowingly to assume the risk that he could not repay the money. That risk became the victims' reality, as they have yet to receive all their principal back despite the passage of nearly five years.

The defendant's theft was not an impromptu, thoughtless act. Rather, it was a multi-step scheme, including nearly 30 bank wire transfers and numerous emails and telephone calls, that he executed in several individual acts over a period of a month. Most notably, the defendant's scheme included multiple acts of deception. The defendant lied or provided false documents to the victims six separate times over a period of 14 days. He went to the trouble of creating, and giving the victims, three separate false documents in an effort to mislead the victims. The amount of effort the defendant put into stealing the money and misleading his victims is an aggravating factor, as a defendant who engages in a more complex scheme is generally more culpable than a defendant who steals money in a single, largely thoughtless act. Further, the defendant had the five days over which he took the victims' money and the month in which he actively and repeatedly misled them, to reconsider what he was doing. He finally admitted what

5

he had done only after the victims repeatedly called and emailed him over a period of 20 days to ask where their money had gone.

The defendant's offense was a serious abuse of the trust his victims, both of whom had previously invested with the defendant, placed in him. As the PSR shows, the impact of the defendant's offense on the victims has been significant. Victim 2 told the Probation Officer that he gave the defendant his "life savings" and that he had been "destroyed" financially as a result of the offense. PSR, ¶ 27. Victim 1 described how the defendant had signed a confession of judgment in the Rockland County state court but then argued that it was invalid and continued to litigate the case against both victims. PSR, ¶ 26. The defendant's abuse of his victims' trust and the impact of his offense are both aggravating factors.

B. History and Characteristics of the Defendant

According to the PSR, there is little in the defendant's background that would explain his offense. The defendant's family, including his wife, parents and siblings, are all aware of the defendant's case and remain supportive. PSR, ¶¶ 50-51, 55. He told Probation his parents were "loving" and denied any issues regarding drugs, alcohol or abuse. His described his childhood as a "middle-class upbringing," with positive religious values, in a wealthy community with a private school education during which he actively played hockey, baseball and basketball. PSR, ¶¶ 52-53. His wife is very supportive, PSR, ¶ 59, and, by all reports, the defendant is a good father. *See, e.g., id.* The defendant denied any history of mental or emotional problems. PSR, ¶ 62. The defendant's childhood was not perfect; few, if any, are. But it is fair to say that most of the defendants this Court sentences do not enjoy such advantages.

REDACTED

REDACTED

The similar conclusion in the Aleph Institute report appears to be similarly pre-ordained, given that the Aleph Institute is "devoted to the development of effective alternative sentencing options."

C. Deterrence and the Need for the
   Sentence to Promote Respect for the Law

The defendant's offense was serious for the reasons stated above. A Guideline sentence is therefore necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

A Guidelines sentence also is required "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need for general deterrence is particularly acute here. Anyone can solicit funds for investment, like the defendant did, and many, like the defendant was, are unregulated. A Guidelines sentence is needed here to deter others who solicit investments and manage funds from fraud and embezzlement.

"The need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson*, 2018 WL 1997975 at *5 (E.D.N.Y. 2018). Courts have

_____



recognized that potential white collar criminals are more likely to be deterred because they are more likely to weigh the potential gains from crime against the risk of punishment than other criminals. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018)(tax offenders are more likely to analyze potential risks and rewards and "to eschew criminal conduct if it will be unprofitable"), *citing United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008)(en banc)("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence"), and *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)("Considerations of deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment to deter it").

Specific deterrence is also relevant here. Even if the defendant never again raised investment funds -- and we have no guarantee of that -- Section 3553(a)(2)(B) directs that the Court consider the need for the sentence "to afford adequate deterrence to criminal conduct" generally, not just the same or similar crime as the offense of conviction. As Judge Weinstein recognized in a tax evasion case, "[a] substantial sentence is required because this is a white collar crime by a highly intelligent and competent defendant who is capable of being deterred." *United States v. Joffe*, 2010 WL 2541667 at *2 (E.D.N.Y. 2010).

D. <u>Need to Avoid Unwarranted Sentencing Disparities</u>

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed

by different federal courts for similar criminal conduct." *Rita v. United States*, 551 U.S. 338, 349 (2007)(internal quotation omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). The Guidelines "help to avoid excessive sentencing disparities," *id.* (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall v. United States*, 552 U.S. 38, 54 (2007).

The defendant's citation to two cases is unavailing. In *Powell*, the defendant's Guideline range was 12 to 18 months, as opposed to the 18 to 24 range recommended by the Guidelines here. The intended loss of $297,213 was less than half the loss here. *Wojtowicz*, a case prosecuted by the undersigned, involved a mitigating factor redacted from the sentencing memoranda that is not present here.

These differences between the two cited cases and this case demonstrate the folly of citing to one or two cherry-picked cases to advocate for a particular sentence. That practice is not likely to be helpful to a sentencing court. The Government could just as easily cite one or more of its carefully chosen cases to advocate for a sentence it would prefer. That effort, however, would ignore the fact that no two cases, and no two defendants, are alike, which renders citations to one case or a small number of cases largely meaningless. Further, the requirement that a sentencing court avoid unwarranted sentencing disparities "does not require a district court to conform its sentence to any single other sentence adduced by a defendant." *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016). Instead, the "primary purpose" of that subsection of Section 3553(a) is "'to reduce unwarranted sentencing disparities' on a nationwide level." *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018)(emphasis in original), quoting *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007).

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant within the applicable Guideline range.

Dated: White Plains, New York
       July 25, 2024

                                  Respectfully submitted,

                                  DAMIAN WILLIAMS
                                United States Attorney

                                              /s

        By: _____
                                James McMahon
                                Assistant United States Attorney
                                (914) 993-1936

cc: Mark Bini, Esq. (by ECF)